IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Zita Leeson Weinshienk

Civil Action No. 09-cv-02247-ZLW-MEH

BRUCE R. FIELD,

     Plaintiff,

v.

BOARD OF WATER COMMISSIONERS, CITY AND COUNTY OF DENVER,

     Defendant.

_____

ORDER
_____

The matter before the Court is the Motion For Summary Judgment filed by Defendant Board of Water Commissioners, City and County of Denver (Denver Water or Defendant) (Doc. No. 51). The Court has reviewed carefully the moving and responding papers and the applicable legal authority.

## I.  Background

Plaintiff Bruce R. Field worked for Denver Water as a Construction Project Manager from October 2002 until he was terminated in October 2008. Starting in 2007, Plaintiff began making allegations of fraud and criminal conduct in connection with the contracting process on three construction projects at Denver Water. Plaintiff's supervisors repeatedly requested that Plaintiff provide substantiation for his allegations, but Plaintiff failed to do so. He continued to assert fraud and wrongdoing in the contracting process, and refused to authorize project payments, placing Denver Water

at risk of legal claims by the project contractors.  On October 13, 2008, Denver Water

Director of Engineering Robert Mahoney terminated Plaintiff on the basis that Plaintiff

had failed to perform his job duties, was insubordinate, and had engaged in conduct

that resulted in a material impairment of his work and the work of his supervisors and

co-workers.

Plaintiff's Amended Complaint pleads three claims for relief stemming from his

employment with and termination by Denver Water:  a first claim for "Retaliation - First

Amendment," a second claim for "Retaliation - § 1981," and a third claim for "Retaliation

- Title VII."  The following facts are undisputed for purposes of this motion, except where

noted.

**A.      Facts Pertaining to First Claim for Relief for "Retaliation - First
            Amendment"**

**1.      Official Duties**

Plaintiff Bruce R. Field was hired by Denver Water as a Construction Project

Manager II on October 7, 2002.  On January 13, 2007, Plaintiff was promoted to

Construction Manager III (CPM III or CPM).[1]  As a CPM III, Plaintiff was responsible for

"advanced field and key administrative construction engineering duties, handling

complex problems relating to all types of projects in the areas of inspection,

construction, project coordination and schedule, contract interpretation and negotiation,

and approval of change orders."[2]  His duties included:  "managing and coordinating

---

[1]Plaintiff's Ex. F (Doc. No. 61-1).

[2]Defendant's Ex. A-1 (Doc. No. 51-1) at 1.

major and complex project construction work and related administrative matters, to include arranging and scheduling for support work," "ensuring that contractor adheres to intent of contract documents and completes project in a timely manner," "[s]upervises assigned personnel, and ensures proper field performance though personal observation and contractor contact; accomplishes liaison function" and "[g]ives expert interpretation of construction aspects of engineering designs, specifications and related contract documents in group and individual settings."[3]  He was, further, "[r]esponsible for ensuring preparation of a variety of technical reports, correspondence and calculations, and sees that project records are maintained."[4]

Plaintiff's supervisor throughout his employment at Denver Water was Chief of Construction Management Michael Leister.  Leister reported to Robert Mahoney, and Mahoney reported to the Manager of Denver Water.  The Manager answers to the Board of Water Commissioners, whose members are appointed by the Mayor of Denver.[5]  The Auditor of the City and County of Denver (Denver Auditor) signs all Denver Water warrants and countersigns all Denver Water agreements.[6]

###   2.   Communications

Plaintiff was the CPM several projects, including the Montclair Pump Station Project (Montclair Project), the Capitol Hill Water Tank Project (Capitol Hill Project), and

---

[3]Id.

[4]Id.

[5]Charter of the City and County of Denver §§ 10.1.2, 10.1.5, 10.1.6.

[6]Id. § 10.1.8.

the Foothills Treatment Plant Project (Foothills Project).  Lillard & Clark Construction

(Lillard & Clark) was the contractor on the Montclair Project, and Garney Construction

(Garney) was the contractor on the Capitol Hill Project and the Foothills Project.  During

his tenure as CPM III on these projects, Plaintiff became concerned about various

aspects of the terms and administration of the projects' construction contracts.  Plaintiff

expressed his concerns in numerous communications, including the following:[7]

(1) On May 25, 2007, Plaintiff sent an email to Mahoney commenting on an email

that Leister had sent to Plaintiff and others summarizing what had been decided at a

meeting earlier that day concerning payment understandings on the Capitol Hill Project

and Foothills Project.  Plaintiff stated, among other things, that he has not agreed to "the

questionable spreadsheet error," that he believed that Garney's markup was not

reasonable, and that Garney was attempting to "gain additional compensation."[8]

(2) On June 2, 2007, Plaintiff contacted Breckenridge Grover of the Denver

Auditor's Office by telephone and told him that he "had concerns about the three

projects, regarding the costs, contracts and other issues."[9]

(3) On July 17, 2008, Plaintiff was contacted by Grover and Dennis Gallagher of

the Denver Auditor's Office by telephone.  Plaintiff told Gallagher that although he had

contacted Grover on June 7, he had not heard back from him.  Gallagher said that he

---

[7]On February 24, 2011, the Court ordered Plaintiff to submit a supplemental brief identifying "each specific, material communication made by Plaintiff which Plaintiff claims was **not** made pursuant to his official duties . . . ."  Plaintiff responded by listing these communications.  See Doc. Nos. 76, 77.

[8]Defendant's Ex. A-13 (Doc. No. 51-13).

[9]Defendant's Ex. A-25 (Doc. No. 51-25) at 1.

4

had called Denver Water and that everything was straightened out.  Plaintiff responded

that nothing was straightened out and asked him whom he had spoken with and what

actions were taken.  Gallagher told Plaintiff to "send us an email with your concerns."[10]

(4) On July 18, 2008, Plaintiff wrote an email to Grover listing concerns that

Plaintiff had "[r]egarding the three current Denver Water CM/GC[11] construction

contracts."  His concerns included questions regarding how the contractors on the

projects were chosen, who approved the contract documents, how the estimates and

profit percentages were determined, and why Denver Water allowed the contractor on

the Capitol Hill Project to submit unauthorized overhead costs.  Plaintiff stated, "[f]rom

my review, these decisions by DW Engineering Managers have allowed the two

contractors to gain unearned compensation of potentially over $6.0 million.  More

detailed specific concerns of each project can/will be supplied."  He went on to state,

"[g]iven the magnitude of this problem, I feel it is appropriate to have an announcement

of this issue from your office or the Mayor's.  I don't feel 'keeping this quiet' is the best

course of action".[12]

(5) On July 21, 2008, Plaintiff emailed Grover, asking him if his office would be

investigating Plaintiff's concerns.  Plaintiff stated, "[a]s the designated Denver Water

---

[10]Id.

[11]Plaintiff states that the "CM/GC" contracts were a type of design/build contract.  See Doc. No. 61 at 2.

[12]Defendant's Ex. A-25 (Doc. No. 51-25) at 3-4.

employee responsible for oversight on these projects, I have a responsibility to report these concerns."[13]

(6) On August 8, 2008, Plaintiff emailed the Denver Mayor's Office, attaching his prior email of July 18, 2008, to Grover.  Plaintiff stated, "I'm writing to inform you of serious problems on construction projects at Denver Water . . . .  Since the Mayor's office appoints the DW Board members and makes recommendations for the Denver Water manager's position, I believe it is appropriate to task the Mayor's Office with looking into this serious matter."[14]

(7) On September 2, 2008, Plaintiff sent an email to Leister and Mark Van Nostrand, an Engineer Manager employed by Denver Water, stating:

> [d]ue to recent events regarding the CM/GC contracts (which include; [sic] hiring of an outside auditor (BKD), erroneous charges in the monthly pay applications for Foothills, a potential lawsuit, questionable accounting on the Cap Hill close out documents and other serious concerns expressed by DW employees, including the Senior Auditor); as the designated Construction Project Manager . . . and in the best interests of Denver Water, I will not sign or authorize this month's pay application for the Foothills CCD project (nor the final closeout of the Capitol Hill Project) until a complete investigation (with detailed audit) is done on that project and the same is done for the Capital Hill Water Tank Project.

> Also, as I have stated in a previous email, I would highly recommend that the Montclair Pump Station project be investigated as well, since recent serious concerns have been brought up about that project.  I have continually

---

[13]Id. at 3.

[14]Plaintiff's Ex. HH (Doc. No. 61-23).

> questioned the contract documents, high fee, high general
> conditions costs, uncertified labor payroll sheets, shared
> savings and numerous other cost concerns on all three of
> these projects.  I will not be held responsible for
> questionable contract language and decisions made by
> Steve Price (former DW Engineering Manager) and others
> on these GM/GC contracts which have allowed the
> contractors (Lillard/Clark and Garney) to gain unearned
> monetary compensation in amounts I calculate to be over $5
> million.[15]

(8) On September 22, 2008, Plaintiff sent an email to the Denver Board of Water

Commissioners stating his concerns about "the contract documents, high fee, high

general conditions costs, uncertified labor payroll sheets, shared savings and numerous

other cost concerns on all three of these projects which allow the contractors to gain

additional compensation."[16]  Tom Gougeon, President of the Denver Board of Water

Commissioners, responded to Plaintiff's email on September 29, 2008, stating that it

was the Board's understanding that the contracts were being closed out with assistance

form Denver Water's internal auditor, and Denver Water was in the process of

contracting with BKD, a national auditing firm, to provide external review of contract

expenditures and procedures.  Gougeon stated that "[t]he Board will rely on the results

of these efforts to determine whether any problems with the contracts exist.  The Board

takes employees' concerns seriously and will seek an objective review of the facts.  If

---

[15]Plaintiff's Ex. MM (Doc. No. 61-33).

[16]Plaintiff's Ex. NN (Doc. No. 61-35).

these reviews uncover any problems, the Board will take appropriate action to protect Denver Water's interests."[17]

(9) On September 29, 2008,[18] Plaintiff wrote a letter to the American Civil Liberties Union of Colorado (ACLU) stating, among other things, that "[a]t Denver Water . . . there is corruption and abuse of power by the top Managers in the Engineering Division, at least three large construction projects and millions of dollars (47.3 million) are going to contractor friends of managers."[19]

(10) On September 30, 2008, Plaintiff sent an email to the Denver Board of Water Commissioners responding to Gougeon's September 29, 2008, email.  Plaintiff stated that he believed that Mahoney was engaging in acts of retaliation against him for disclosing information "to a Denver Water official or a government agency."  He stated that he did not think that it was in Denver Water's best interest to employ Dave Mallory as the internal auditor because he was inexperienced and unqualified, and that he did not think that it was in Denver Water's best interest to use BKD as the external auditor because they weren't qualified and had a conflict of interest.[20]

---

[17]Plaintiff's Ex. RR (Doc. No. 61-44).

[18]The letter is actually dated September 29, 2009.  Plaintiff states that that date is incorrect and that the letter was written on September 29, 2008.  See Doc. No. 77 n.1.  Defendant does not appear to dispute that the letter was written on September 29, 2008.

[19]Plaintiff's Ex. PP (Doc. No. 61-40).

[20]Plaintiff's Ex. RR (Doc. No. 61-44, 61-45).

### 3.     Termination

On September 9, 2008, Leister wrote a memorandum to Mahoney in which he described the manner in which Plaintiff's concerns regarding contract payment and administration had been addressed to date.  Leister stated that the internal auditor "has seen nothing so far that cannot be corrected by getting invoices, and by auditing after project closeout."  He described a recent meeting at which it appeared that consensus had been reached as to how to handle the issues raised by Plaintiff, and Plaintiff appeared to agree to resume his duties, but then "changed his mind and stated he would not authorize the pay estimate or assist in drafting a letter to the contractor requesting documentation."  Leister stated that Plaintiff's "discomfort with the CM/GC contract method has continued to created conflict with contractors and DW staff.  This has resulted in unnecessary work for me, as well, [sic] as other DW managers and his co-workers.  [Plaintiff] will not listen to reason or take direction regarding the CMGC contracts."  He continued, "I believe that [Plaintiff] is now acting in his own interest.  He is willing to go to extreme lengths to prove his unreasonable belief that the CM/GC contractors and DW management are corrupt.  It was clear to me at the Wednesday meeting that no one else at the meeting agreed with [Plaintiff].  There is a broken trust between DW and [Plaintiff] that I do not believe can be repaired.  If he is allowed to continue in this manner, he is putting the Board at risk of claims from the contractor involving breach of contract or bad faith or unfair dealing."  Leister stated that Plaintiff now "refuses to approve even the parts of the pay estimates which he agreed are

correct." He concluded, "I do not believe it is in Denver Water's interests to continue to employ him."[21]

After discussing the situation with Plaintiff, on September 15, 2008, Mahoney stated that no formal action would be taken against Plaintiff pending Plaintiff's completion of seven listed items, including that Plaintiff would be "given a final opportunity to address outstanding contract issues in a <u>professional and meaningful</u> <u>way</u>." Mahoney required that Plaintiff provide details of his allegations of fraudulent accounting and any other issues so that an assessment of their validity could be made.[22]

On October 13, 2008, Mahoney wrote a six-page letter to Plaintiff detailing his finding of good cause for Plaintiff's termination based on Plaintiff's failure to complete the tasks set forth in Mahoney's September 15, 2008, letter, including his failure to provide substantiation for any of the allegations that he had made concerning the projects he worked on. Mahoney wrote that, "[w]hen we disagreed with you, you refused to accept anyone's reasoning but your own. Sort of breaching the contracts and risking expensive and drawn out litigation and project delays, no solutions appease you. You appear to be incapable of understanding that reasonable professionals can legitimately disagree about the best approach to take in a given situation." He went on, "[a]s your division director, I have provided you numerous opportunities to produce

---

[21]Defendant's Ex. A-19 (Doc. No. 51-19).

[22]Defendant's Ex. A-20 (Doc. No. 51-20).

evidence of your allegations, but you have not.  No one that you have accused,

therefore, can refute you or defend themselves against your charges.  You have

smeared their good names and reputations."  Concluding that Plaintiff had "failed to

perform your job duties, were insubordinate, and engaged in conduct that resulted in a

material impairment of your work and the work of your supervisors and coworkers,"

Mahoney stated that Plaintiff was terminated effective October 13, 2008.[23]

> **B.    Facts Pertaining to Second and Third Claims for Relief for and "Retaliation - § 1981" and "Retaliation - Title VII"**

James Phillips was the Construction Inspector assigned to the Montclair Project,

and reported directly to Plaintiff.  Phillips is African-American.  Plaintiff states in his

affidavit that from mid-2006 until April of 2007, Lillard made offensive racial remarks

about Phillips to Plaintiff.  Plaintiff states that he reported these statements to Mahoney

and Leister,[24] and that Leister responded that Lillard "is telling me a lot worse things

about [Phillips] when he's calling me," such as that "[h]e's not doing his job" and "[h]e's

off playing cards."[25]  Phillips was removed from the Montclair Project in May of 2007.

Plaintiff was terminated on October 13, 2008.

---

[23]Defendant's Ex. A-24 (Doc. No. 51-24).

[24]Defendant disputes that Plaintiff reported such remarks to Mahoney and Leister.

[25]Plaintiff's Ex. P. (Doc. No. 61-39) at 1.

## II.     Legal Standard

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[26]

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.[27]

The moving party need not negate the nonmoving party's claims, but need only point to an "absence of evidence to support the nonmoving party's case."[28]  The party opposing the motion then must come forward with evidence sufficient to create a genuine issue of material fact.[29]  On summary judgment the district court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party.[30]

## III.     Analysis

---

[26]Fed. R. Civ. P. 56(a).

[27]Fed. R. Civ. P. 56(c).

[28]Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

[29]Id. at 324.

[30]Couch v. Board of Trustees, 587 F.3d 1223, 1235 (10th Cir. 2009).

**A.      Municipal Liability**

"A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff.  Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged."[31]  Here, Plaintiff has failed to submit any evidence indicating that Defendant's allegedly unlawful conduct was the result of any municipal policy or custom.  Plaintiff states that the fact that Phillips filed a similar lawsuit constitutes evidence of a municipal policy or custom.  However, Phillips' lawsuit has been dismissed by this Court on summary judgment.[32]  Plaintiff also cites to an excerpt of deposition testimony from an unidentified witness who stated that "to my knowledge," no one has ever claimed protection under Denver Water's whistle blower policy.[33]  This statement does not constitute evidence of any municipal policy or custom supporting wrongful conduct; if anything, it indicates a lack of any such policy or custom.  Plaintiff has failed to submit any evidence supporting municipal liability under § 1983, and summary judgment is appropriate on that basis alone.  Nonetheless, the Court will proceed to examine each of Plaintiffs' claim for relief.

**B.      First Claim for Relief for "Retaliation - First Amendment"**

Plaintiff's first claim for relief alleges that Defendant terminated him in retaliation for his exercise of his First Amendment right to free speech.  "[T]he First Amendment

---

[31]Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993).

[32]See Case No. 09-cv-01515-CMA-CBS, Doc. No. 98.

[33]Plaintiff's Ex. TT (Doc. No. 61-50).

protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."[34]  However, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."[35]  Thus, "[t]he problem in any case is to arrive at balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[36]

The Court achieves that balance by applying the five-prong "Garcetti/Pickering" test.[37]  In the first prong of that test, the court must "determine whether the employee speaks pursuant to his official duties.  If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created."[38]  If the speech was not made pursuant to the employee's official duties, then the court moves to the second prong and determines whether the subject matter of the speech is a matter of public concern.[39]  If the speech is on a matter

---

[34]Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).

[35]Id. at 418.

[36]Pickering v. Board of Education, 391 U.S. 563, 569 (1968).

[37]Rohrbough v. University of Colorado Hospital, 596 F.3d 741, 745 (10th Cir. 2010).

[38]Deutsch v. Jordan, 618 F.3d 1093, 1097-98 (10th Cir. 2010).

[39]Id.

14

of public concern, then the court proceeds to the third, fourth and fifth prongs, and determines "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer," "whether the employee has shown that "his speech was a substantial factor or a motivating factor in a detrimental employment decision," and, finally, whether "the employer [has] demonstrate[d] that it would have taken the same action against the employee even in the absence of the protected speech."[40]  The first three prongs of the test are issues of law to be resolved by the court, while the last two are issues of fact.[41]

Tenth Circuit decisions "have taken a broad view of the meaning of speech that is pursuant to an employee's official duties," and the first prong of the analysis is a "heavy barrier."[42]  Speech made pursuant to an employee's duty to report a particular activity is usually within that employee's official duties.[43]  Here, Plaintiff expressly admitted that he had an official duty to report the activities which were the subject of his communications, telling Grover of the Denver Auditor's Office that "[a]s the designated Denver Water employee responsible for oversight on these projects, I have a responsibility to report these concerns."[44]  This admission is fatal to Plaintiff's argument

---

[40]Id.

[41]Rohrbough, 596 F.3d at 745.

[42]Id. (quoting Thomas v. City of Blanchard, 548 F.3d 1317, 1324 (10th Cir. 2008) and Casey v. West Las Vegas Indep. School Dist., 473 F.3d 1323, 1331 (10th Cir. 2007)).

[43]Id. at 746-47.

[44]Defendant's Ex. A-25 (Doc. No. 51-25) at 3.

that the subject speech did not fall within his official duties.  However, even without this admission, Plaintiff cannot prevail on the first prong of the <u>Garcetti</u>/<u>Pickering</u> test.

Plaintiff's official duties as a CPM III included performing "contract interpretation and negotiation," "managing and coordinating major and complex project construction work and related administrative matters," and giving "expert interpretation of construction aspects of engineering designs, specifications and related contract documents."[45]  Despite the fact that the topics raised in Plaintiff's communications fall squarely within these areas of duty, Plaintiff argues that the communications at issue were not made pursuant to his official duties because his official duties did not include applying a contract with which he disagreed, or approving pay applications that he thought were incorrect.  However, a government employee's speech does not become protected merely because the speech expresses disagreement with work policies, practices, or events, since the First Amendment does not invest employees "with a right to perform their jobs however they see fit."[46]  The Supreme Court has recognized that while "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance," the public interest is protected by a "powerful network of legislative enactments - such as whistle-blower protection laws and labor codes," which, in conjunction with "other applicable constitutional provisions and mandates of the criminal and civil laws, protect employees and provide checks on supervisors who would order

---

[45]Defendant's Ex. A-1 (Doc. No. 51-1)

[46]<u>Green v. Board of County Commissioners</u>, 472 F.3d 794, 801 (10th Cir. 2007) (quoting <u>Garcetti</u>, 547 U.S. at 422)).

unlawful or otherwise inappropriate actions."[47]   As such, expressions that employees make pursuant to their official duties are not afforded First Amendment protection, even if they seek to expose wrongdoing.[48]   Plaintiff's argument is unavailing.

Additionally, "speech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties under Garcetti/Pickering."[49]   All of the communications at issue, with the exception of Plaintiff's letter to the ACLU, were directed to people within Plaintiff's chain of command.[50]   As for the ACLU communication, Plaintiff has submitted no evidence that Defendant was aware of that communication at any point prior to his termination, and thus there is no evidence to support the causation prong under Garcetti/Pickering.

Plaintiff cites to Montgomery v. Board of County Commissioners[51] in support of his argument that his speech was not made pursuant to his official duties because he had no duty to report or monitor the conduct of his employers.   In Montgomery, the court denied the defendant's motion for summary judgment on the basis that there was a disputed issue of material fact as to whether the plaintiff's official duties as Assistant Chief Deputy Coroner included toxicology testing and death determinations, which were the subjects of the statements at issue.   Here, Plaintiff's official duties did include the

---

[47]Garcetti, 547 U.S. at 425-26.

[48]See id.

[49]Rohrbough, 596 F.3d at 747.

[50]See Part I.A.1., *supra*.

[51]637 F. Supp. 2d 934 (D. Colo. 2009).

subject areas addressed in the communications at issue.  The <u>Montgomery</u> court's statement that "[s]peech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of [state] officials, in terms of content, clearly concerns matters of public import,"[52] addressed the second prong of the <u>Garcetti</u>/<u>Pickering</u> test, which this Court does not reach in the present case.

Plaintiff also cites to <u>Reinhardt v. Albuquerque Public Schools Board of Education</u>[53] in support of his argument that his speech was not related to his official job duties.  However, <u>Reinhardt</u> is distinguishable, since the plaintiff in that case was hired as a speech-language pathologist, but her communications consisted of allegations that the state was not complying with the state Individuals with Disabilities Education Act (IDEA).  The court held that the plaintiff's speech was not made pursuant to her job duties because she "was not hired to ensure IDEA compliance at Albuquerque public schools.  She was hired to provide speech and language services to special education students."[54]  Further, she directed her speech outside of her chain of command.[55]  Here, Plaintiff was hired to handle contract negotiation, administration and payments, and his speech was directed within his chain of command.  <u>Reinhardt</u> does not assist Plaintiff in this case.

**C.    Second and Third Claims for Relief for "Retaliation - § 1981" and**

---

[52]<u>Id.</u> at 941 (quoting <u>Hulen v. Yates</u>, 322 F.3d 1229, 1237 (10th Cir. 2003)).

[53]595 F.3d 1126 (10th Cir. 2010).

[54]<u>Id.</u> at 1136.

[55]<u>Id.</u> at 1137.

**"Retaliation - Title VII"**

A plaintiff claiming retaliation under Title VII[56] or 42 U.S.C. § 1981 must first establish a prima facie case by showing (1) that he or she engaged in protected opposition to discrimination, (2) adverse action by the employer subsequent to the protected activity, and (3) a causal connection between the plaintiff's protected activity and the adverse action.[57]

Plaintiff alleges that he was terminated in retaliation for reporting to Mahoney and Leister that Lillard had made racially derogatory comments about Phillips.[58]  As set forth above, to establish the third element of his prima facie case, a plaintiff must show a causal connection between the protected activity and his termination.[59]  The plaintiff "may establish the causal connection by proffering 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'"[60]  However, "temporal proximity between the protected activity and the retaliatory conduct must be very close in time.  Otherwise, "'the plaintiff must offer additional evidence to establish causation.'"[61] The Tenth Circuit has held that a period of

---

[56]42 U.S.C. § 2000e *et seq.*

[57]<u>Sanchez v. Denver Public Schools</u>, 164 F.3d 527, 533 (10th Cir. 1998); <u>Somoza v. University of Denver</u>, 513 F.3d 1206, 1211 (10th Cir. 2008) ("[t]he test for establishing a prima facie case for retaliation is the same under both Title VII and 42 U.S.C. § 1981.").

[58]Again, Defendant disputes that Plaintiff ever reported such remarks.

[59]<u>See</u> <u>Annett v. University of Kansas</u>, 371 F.3d 1233, 1239-40 (10th Cir. 2004).

[60]<u>Id.</u> (quoting <u>Bullington v. United Air Lines, Inc.</u>, 186 F.3d 1301, 1320 (10th Cir. 1999)).

[61]<u>Haynes v. Level 3 Communications, LLC</u>, 456 F.3d 1215, 1228 (10th Cir. 2006) (quoting <u>O'Neal v. Ferguson Constr. Co.</u>, 237 F.3d 1248, 1253 (10th Cir. 2001)).

three months between the protected activity and the adverse action, standing alone, is insufficient to establish causation.[62]

Here, Plaintiff has failed to submit any evidence whatsoever indicating a causal connection between Plaintiff's reporting of racially derogatory statements by Lillard and Plaintiff's termination.  Although Plaintiff has submitted no evidence expressly stating when he reported the statements, the only reasonable inference to be taken from the evidence is that Plaintiff reported the statements while Phillips was still working on the Montclair Project, since, according to Plaintiff, Leister responded to Plaintiff's report by saying that Lillard "is telling me a lot worse things about [Phillips] when he's calling me," such as that "[h]e's not doing his job."[63]  Phillips was removed from the Montclair Project in May 2007.  Plaintiff was not terminated until October 2008, well over a year later.  Thus, temporal proximity cannot establish causation in this case, and there is no other evidence before the Court supporting causation.  Summary judgment properly is entered in Defendant's favor on the third claim for relief.

Accordingly, for the reasons set forth above, it is

ORDERED that the Motion For Summary Judgment filed by Defendant Board of Water Commissioners, City and County of Denver (Doc. No. 51) is granted.  It is

FURTHER ORDERED that this action is dismissed with prejudice.  It is

---

[62] See id.

[63] Plaintiff's Ex. P. (Doc. No. 61-39) at 1.

FURTHER ORDERED that a separate Judgment shall enter pursuant to Fed. R.

Civ. P. 58(a).

DATED at Denver, Colorado, this 28th day of March, 2011.

BY THE COURT:

_____
ZITA LEESON WEINSHIENK, Senior Judge
United States District Court